IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BROCK FREDIN,

                        Plaintiff,

     v.

ADAM KLASFELD, JAF COMMUNICATIONS INC.,
doing business as "THE MESSENGER,"
ALLISON GREENFIELD, and FRANK RUNYEON,

                       Defendants.

OPINION and ORDER

24-cv-45-jdp

---

Plaintiff Brock Fredin, a Wisconsin resident, operates an X (formerly known as Twitter) account in which he criticized defendant Allison Greenfield, the law clerk of the judge presiding over a civil fraud case brought by the state of New York against Donald J. Trump, other individuals, and related business entities. Trump's reposting of one of Fredin's posts about Greenfield led to the judge issuing a gag order barring Trump from commenting about court personnel. During his coverage of the Trump fraud lawsuit, defendant reporter Adam Klasfeld authored an article in an online publication called *The Messenger* unearthing Fredin's history of harassment of other women that led to restraining orders being issued against him, and comparing Fredin's criticism of Greenfield to that history. Defendant reporter Frank Runyeon authored an article in online publication *Law360* disputing Fredin's assertion that Greenfield broke court-personnel ethics rules. Fredin brings this lawsuit under the court's diversity jurisdiction, contending that defendants Greenfield, Klasfeld, *The Messenger*, and Runyeon conspired to defame him with those articles, tortiously interfere with a contract, and intentionally inflict emotional distress upon him.

Defendants move to dismiss Fredin's complaint on a number of grounds, including lack of personal jurisdiction and failure to state a claim upon which relief may be granted. I conclude that this court may exercise personal jurisdiction over defendants but that Fredin's allegations do not support a claim for defamation or under any other legal theory. Before dismissing the case in its entirety, I will give Fredin a chance to amend his complaint to fix his pleading problems.

BACKGROUND

Plaintiff Fredin states that he resides in Hudson, Wisconsin. He operates an X account with the handle "JudicialProtest." Starting in September 2023, Fredin made posts through that account about what he perceived as corruption in the litigation of a civil fraud case brought by the state of New York against Donald J. Trump, other individuals, and related business entities. *New York v. Trump*, No. 452564/2022 (N.Y. Sup. Ct.). The judge in that case was Arthur F. Engoron. His principal law clerk was defendant Allison Greenfield.

Shortly before or during the trial in the New York case, Fredin posted a photo of Greenfield posing with New York Senator Chuck Schumer, along with the post "Why is Judge Engoron's Principal Law Clerk, Allison R. Greenfield, palling around with Chuck Schumer?" Dkt. 1, ¶ 19. Trump "retruthed" Fredin's post on the Truth Social social media site. That led to Judge Engoron issuing a gag order against Trump barring him from commenting about court personnel. Fredin made additional posts accusing Engoron and Greenfield of various misconduct, including that Greenfield had made political donations exceeding the legal limit for staff of the New York court system.

The Trump Organization fraud case, including Trump's reposting of Fredin's post and the court's gag order, was the subject of intense media coverage. Defendant reporter Adam Klasfeld covered the trial for defendant JAF Communications, doing business as *The Messenger*, a now-defunct online publication. *The Messenger* published an article by Klasfeld titled "The Story Behind Trump's Gag Order Involves a Man Under Criminal Investigation for Stalking (Exclusive)." Dkt. 2-1, at 2. Klasfeld's article stated in part:

> An investigation by the Messenger has found that 40-year-old Wisconsin resident Brock Fredin—the man behind the @JudicialProtest account on X, the website formerly known as Twitter—has a prolific history of civil and criminal litigation over his harassment of women that echoes his attacks on Greenfield. Fredin has been hit with 50-year restraining orders barring him from contacting three women, and he has been criminally convicted multiple times for violating two of those orders. He is currently under criminal investigation for more suspected restraining order violations and possible stalking.

*Id.* at 3. Fredin believes that defendant Greenfield "was unethically leaking anti-Trump information and talking points" to Klasfeld, and that Klasfeld authored the article at the behest of Engoron and Greenfield in attempt to dissuade Fredin from continuing his coverage of the trial and perceived misconduct by Engoron and Greenfield.

Fredin also sues defendant Frank Runyeon, a reporter for online publication *Law360*, who also covered the Trump fraud trial. *Law360* published an article by Runyeon addressing Fredin's claim that defendant Greenfield's political donations exceeded the limit for court-system employees, and Runyeon followed with a post on X stating, "Law clerk Allison Greenfield did not violate ethics rules with her >$500 political campaign donations, legal experts told @Law360, citing exceptions that allow her to pay for tickets to events as she seeks her own Manhattan judgeship," and linking to his article.

Fredin also alleges that defendants Greenfield and Klasfeld, either directly or indirectly, through third parties, intentionally made contact with [his] professional work" and that Klasfeld, Greenfield, and Runyeon "directly reached out to [his] professional activities." *Id.* at 10. He also states that he lost his job because of defendants' actions. (Fredin states this in his brief instead of his complaint but considering that he is proceeding as a pro se litigant I won't force him to amend his complaint to include this fact.)

I will discuss additional facts as they become relevant to the analysis.

## ANALYSIS

Each defendant has moved to dismiss Fredin's complaint. Dkt. 8 (Greenfield); Dkt. 18 (Runyeon); Dkt. 37 (Klasfeld and JAF Communications). Defendants raise multiple problems with the complaint, including that the court lacks personal jurisdiction over defendants, that the complaint fails to state a claim for relief against them, and that they have not been properly served.

### A.  Personal jurisdiction

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the burden of proof rests on the plaintiff to make a prima facie showing that the court may exercise jurisdiction over the defendant. *Hyatt International Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). The court must accept as true all plausible allegations in the complaint, but the court may also consider evidence submitted by the parties. *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 392–93 (7th Cir. 2020). All genuine factual disputes must be resolved in the plaintiff's favor. *See Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).

This court may exercise personal jurisdiction where a defendant would be amenable to suit under Wisconsin's long-arm statute, Wis. Stat. § 801.05, and the Due Process Clause. *Lexington Ins. Co. v. Hotai Ins. Co., Ltd.*, 938 F.3d 874, 878 (7th Cir. 2019) (citing *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012)). Wisconsin's long-arm statute has been interpreted to confer jurisdiction "to the fullest extent allowed under the due process clause." *Felland*, 682 F.3d at 678; *see also Rasmussen v. Gen. Motors Corp.*, 2011 WI 52, ¶ 17, 335 Wis. 2d 1, 803 N.W.2d 623 ("the Wisconsin long-arm statute is to be construed liberally in favor of the exercise of personal jurisdiction").

### 1. General jurisdiction

The Supreme Court has identified two types of personal jurisdiction: general and specific. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414, 415 nn. 8, 9 (1984). If a defendant has such systematic and continuous contact with the forum that it might be regarded as at home there, the court can exercise general jurisdiction, meaning that the defendant would be subject to personal jurisdiction in that court for any claim. *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014). That isn't the case here. The individual defendants say that they live and work in New York, without any meaningful connections to Wisconsin. *The Messenger* was headquartered in Florida with offices in New York, Washington, D.C., and Los Angeles. Runyeon's publication, *Law360*, is headquartered in New York. The complaint and the parties' evidence show that defendants' only meaningful contact with Wisconsin was defendants' X postings or news articles published to the internet, along with Fredin's vague mention of defendants' communications with him and his employment or professional activities. A smattering of communications into a state doesn't confer general jurisdiction over defendants. Nor does the fact that defendants' internet postings could be viewed in Wisconsin.

*See, e.g., Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) ("Nor is the maintenance of a public Internet website sufficient, without more, to establish general jurisdiction."); *Campbell Pet Co. v. Miale*, 542 F.3d 879, 884 (Fed. Cir. 2008) ("defendants' website does not establish general jurisdiction in Washington, because it was not specifically directed at Washington, but instead is available to all customers throughout the country who have access to the Internet." (internal quotation omitted)).

### 2. Specific jurisdiction

As for whether this court may exercise specific jurisdiction over defendants, each set of defendants contends that Wisconsin's long-arm statute doesn't confer jurisdiction. The parties discuss two sections of that statute: Wis. Stat. §§ 801.05(3) ("Local act or omission") and (4) ("Local injury; foreign act"). Those provisions state:

> (3) Local act or omission. In any action claiming injury to person or property within or without this state arising out of an act or omission within this state by the defendant.
>
> (4) Local injury; foreign act. In any action claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant, provided in addition that at the time of the injury, either:
>
>> (a) Solicitation or service activities were carried on within this state by or on behalf of the defendant; or
>>
>> (b) Products, materials or things processed, serviced or manufactured by the defendant were used or consumed within this state in the ordinary course of trade.

*Id.*

Defendants argue that that none of their actions took place in Wisconsin to fit the "local act" provision and that their actions don't fall within the "local injury, foreign act" provision either because they didn't perform solicitation activities and because the internet

articles and X postings aren't enough to meet the "products . . . used or consumed within this state" provision. Fredin's response is unfocused, but he argues that this court has personal jurisdiction over defendants because their "activities significantly affect Wisconsin and were conducted over the internet within the state." Dkt. 41, at 8. I don't take him to be contesting defendants' assertions that their actions were foreign acts rather than local. So this court doesn't have personal jurisdiction over defendants under § 801.05(3).

As for whether defendants' internet articles and X postings are enough to qualify under § 801.05(4), defendant Greenfield cites *Salfinger v. Fairfax Media Ltd.*, 2016 WI App 17, 367 Wis. 2d 311, 876 N.W.2d 160, for the proposition that an article published online doesn't satisfy the due process portion of the analysis. But in *Salfinger*, the Wisconsin Court of Appeals concluded that an allegedly defamatory article published online by the *Sydney (Australia) Morning Herald* did authorize jurisdiction under § 801.05(4). 2016 WI App 17, ¶ 20 ("We therefore agree with Salfinger that an article published online is 'processed' within the meaning of Wis. Stat. § 801.05(4)(b)." None of the defendants grapple with this aspect of *Salfinger*. Given the liberal constriction that I must give § 801.05, I conclude that the articles here meet the requirements of Wisconsin's long-arm statute.

Nonetheless, the exercise of jurisdiction must still comport with due process. The focus is on foreseeability—whether the defendant should reasonably anticipate being sued in the forum state because of its activities there. *Kinslow v. Pullara*, 538 F.3d 687, 691 (7th Cir. 2008). The Court of Appeals for the Seventh Circuit has distilled the constitutional test for specific jurisdiction into three issues: (1) the defendant must have purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at that state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice. *Felland*, 682 F.3d at 673.

The standard for determining whether a defendant has purposefully availed itself of or purposefully directed its activities at a forum depends on the type of claim at issue. *Id.* at 674. In intentional tort cases, the court of appeals has applied the test originally articulated in *Calder v. Jones*, 465 U.S. 783 (1984). *See, e.g., Tamburo*, 601 F.3d at 703. Under that test, a defendant purposefully directs its activities at the forum state if that defendant engaged in (1) intentional and allegedly tortious conduct; (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state. *Id.* at 703 (interpreting *Calder*, 465 U.S. at 789–90).

Fredin makes a prima facie showing of the first and third prongs. Among other things, he alleges that Klasfeld, with Greenfield's assistance, authored a defamatory article about him in *The Messenger*, and that Klasfeld, Greenfield, and Runyeon conspired to contact people connected to his employment or professional activities, presumably in Wisconsin, which led to his termination. And defendants knew that the Fredin would be injured in Wisconsin; the article states that he is a Wisconsin resident.[1]

The second prong, whether defendants "expressly aimed" their conduct at Wisconsin, is a closer question. Defendants say that although their articles and X postings were available on the internet, their publications don't focus on Wisconsin-based stories and they didn't travel to Wisconsin for their articles.

---

[1] Defendants Klasfeld and JAF Communications state that are that "[t]here is reason to believe Fredin is not a Wisconsin resident" because Fredin suggested in another court proceeding that he was neither a resident of Wisconsin nor Minnesota. Dkt. 38, at 5. But Fredin asserts that he is a Wisconsin resident, and I must resolve that dispute in Fredin's favor.

I agree with defendants that the mere fact that their articles were on the internet and thus viewable in Wisconsin is not enough to confer personal jurisdiction over them: courts generally require "something more" than harm to a plaintiff located in their home state. *Tamburo*, 601 F.3d at 706. "'Courts should be careful in resolving questions about personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or operates a website that is accessible in the forum state.'" *be2 LLC v. Ivanov*, 642 F.3d 555, 558–59 (7th Cir. 2011) (quoting *Illinois v. Hemi Grp., LLC*, 622 F.3d 754, 760 (7th Cir. 2010)). The defendant "must in some way target the forum state's market." *Id.* at 559.

Courts analyzing internet-based harm often invoke *Calder* (a non-internet case), in which actor Shirley Jones brought a libel suit in California state court against a reporter and an editor for the National Enquirer, a national weekly publication headquartered in Florida, with a circulation of roughly 600,000 in California. 465 U.S. 783. The Court concluded that personal jurisdiction in California was appropriate because that state was "the focal point both of the story and of the harm suffered." *Id.* at 789. In doing so the Court considered contracts between defendant and California such as phone calls to sources in California, the story was about Jones's activities in California, and that the "brunt of the harm, in terms both of [Jones's] emotional distress and the injury to her professional reputation, was suffered in California," the state in which the Enquirer had its largest circulation. *Id.* at 788–89.

In *Tamburo*, the court of appeals concluded that personal jurisdiction in the plaintiff's home state (Illinois) was appropriate for defendants who used websites and blast emails to allegedly defame and generate a boycott of plaintiff's Illinois business, including by listing his address and urging others to harass him. 601 F.3d at 706. The court concluded that other

foreign defendants were not subject to personal jurisdiction there for merely "facilitat[ing] the posting of some of the individual defendants' tortious messages on the company's private . . . email listserve" without knowledge that that the plaintiff "operated his business in Illinois or with the specific purpose of inflicting injury there." *Id.* at 708.

Greenfield notes that in *Salfinger*, the Wisconsin Court of Appeals concluded that the *Sydney Morning Herald's* online publication of an article allegedly defaming an Australian citizen them living in Wisconsin did not comport with due process, in part because the article didn't mention Wisconsin in any way; the only connection to Wisconsin was that the plaintiff had moved there. 2016 WI App 17, ¶ 38. It concluded that the *Herald* website's Wisconsin-targeted advertisement system wasn't the "something more" needed to confer personal jurisdiction over the *Herald* for its online content. *Id.*, ¶ 51. And there is nothing in the record suggesting that *The Messenger* or *Law 360* are publications aimed at Wisconsin in particular or have voluminous readerships here.

Nonetheless, unlike in *Salfinger*, Klasfeld's article specifically notes Fredin's Wisconsin residence and focuses in part on his involvement in court proceedings in Wisconsin and Minnesota. And Fredin alleges more Wisconsin contacts by defendants than just placement of the articles on the internet. He also brings tortious interference claims against defendants for conspiring to contact persons connected to his employment or professional activities, which led to his termination. This is the "something more" making the current case more like *Calder* and *Tamburo*. *See Tamburo*, 601 F.3d at 707 ("Tortious acts aimed at a target in the forum state and undertaken for the express purpose of causing injury there are sufficient to satisfy *Calder's* express-aiming requirement."). I conclude that Fredin's meets the express-aiming prong of the test, and thus shows that defendants purposefully directed activities at Wisconsin.

That leaves the questions whether Fredin's alleged injury arose from defendants' Wisconsin-related activities, and whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Felland*, 682 F.3d at 673. Fredin's allegations meet the injury requirement, as he states that he was harmed by the defamatory articles and by defendants contacting his employer and professional activities.

As for whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice, the burden is on defendants to make a compelling case that exercising jurisdiction over it would be unreasonable. *Id.* at 677. Courts typically consider the following factors: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies. *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

Defendants do not meaningfully address these issues other than to say that it would be unfair to force them to defend themselves in Wisconsin because Fredin generated the conflict by "injecting himself" into the New York Trump fraud case and then he first brought this lawsuit in New York state court before voluntarily dismissing it. But I've already concluded that Fredin is alleging that defendants purposely directed their conduct at Wisconsin, so the fact that the parties' conflict started in another state doesn't control the analysis. And although it's not efficient for Fredin to bring his lawsuit in one forum, dismiss it, and refile it here, as the plaintiff he generally remains free to choose the forum. Otherwise, defendants always face burdens when litigating in out-of-state forums, and "there is no suggestion that [defendants'] hardship would be any greater than that routinely tolerated by courts exercising specific

jurisdiction against nonresidents." *Felland*, 682 F.3d at 677. And "Wisconsin has a strong interest in providing a forum for its residents to seek redress for torts inflicted by out-of-state actors and injuries suffered within the state." *Id.* So I conclude that defendants haven't met their burden of showing that the exercise of jurisdiction in Wisconsin offends traditional notions of fair play and substantial justice. I conclude that this court may exercise personal jurisdiction over defendants.

## B. Failure to state a claim

### 1. Defamation

Defendants also contend that Fredin's complaint fails to state any claim upon which relief may be granted. The core of Fredin's complaint reflects his belief that defendants conspired to libel him through their articles and X postings linking to those articles. So I'll begin with Fredin's defamation claims. The parties dispute which state's laws—New York's or Wisconsin's—govern Fredin's claims. I need not answer that question because Fredin's complaint doesn't state a claim for relief under either state's laws.

Under Wisconsin law, a defamation plaintiff must show that the defendant (1) made a false statement that was communicated to someone other than the person defamed; (2) the statement was not privileged; and (3) the statement would tend to harm the defamed person's reputation so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *See Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 534, 563 N.W.2d 472, 477 (1997). In New York, the elements are: "(a) a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion, or disgrace, (b) published without privilege or authorization to a third party, (c) amounting to fault as judged by, at a minimum, a negligence standard, and (d) either causing special harm or constituting

defamation per se." *Greenberg v. Spitzer*, 155 A.D.3d 27, 41, 62 N.Y.S.3d 372, 383 (2017). "Substantially true" statements cannot be the basis for a defamation claim. *Laughland v. Beckett*, 2015 WI App 70, ¶ 23, 365 Wis. 2d 148, 870 N.W.2d 466; *Proskin v. Hearst Corp.*, 14 A.D.3d 782, 783, 787 N.Y.S.2d 506, 507 (2005).

### a. Klasfeld's article in *The Messenger*

I'll start with Klasfeld's article in *The Messenger*. Fredin contends that the article "accused [him] of committing a serious crime, i.e. criminally harassing or attacking a public official [defendant Greenfield] rather than criticizing the public official for misconduct, and are therefore defamatory *per se*." Dkt. 1, ¶ 45. This is in part premised on the article's discussion of Fredin's "prolific history of civil and criminal litigation over his harassment of women that echoes his attacks on [defendant] Greenfield," Dkt. 1-1, at 3. In particular, Klasfeld wrote that Fredin was the subject of restraining orders for harassing women, was convicted of violating those orders, and at the time of publication was under criminal investigation for violating a restraining order and suspicion of stalking. *Id.* at 5–6. Klasfeld also wrote that "Fredin's penchant for filing at least a dozen retaliatory lawsuits—in state and federal jurisdictions in Wisconsin and Minnesota—led then-U.S. District Judge Susan Richard Nelson to declare him a "malicious and vexatious litigant." *Id.* at 6. Fredin contends that Klasfeld made defamatory statements about Fredin regarding these previous court proceedings and then about how Fredin's X postings about Greenfield "echo" or "mirror" Fredin's transgressions toward the women in these other proceedings.

Klasfeld contends that Fredin is a public figure and thus he must demonstrate actual malice to prevail. *Torgerson*, 210 Wis. 2d at 536; *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015). This requirement is rooted in the First and Fourteenth Amendments of the U.S.

Constitution, which create a conditional constitutional privilege on the publication of statements about public figures. *Id.* (citing *Masson v. New Yorker Magazine, Inc.* 501 U.S. 496, 510 (1991); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). Public figures are generally defined as those who are "intimately involved in the resolution of important public questions." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164 (1975). An individual "may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts," or he may "voluntarily inject[] himself or [be] drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). Whether Fredin is a public figure is a question of law. *Lewis v. Coursolle Broad.*, 127 Wis. 2d 105, 110, 377 N.W.2d 166 (1985); *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

Defendant Klasfeld argues that Fredin injected himself into an extremely publicized public controversy (the Trump fraud trial) by making X posts questioning the integrity of Judge Engoron and Greenfield. The mere act of posting itself can't suffice to make someone a public figure, otherwise everyone on social media opining on a public controversy would be one. But Fredin was drawn into the public controversy and therefore became a limited-purpose public figure when his post was "retruthed" by Trump, leading to a gag order being issued against Trump, all of which dramatically elevated the fame of Fredin's X account. I agree with Klasfeld that Fredin a voluntary public figure and that the actual malice standard applies.

"Actual malice does not involve bad intent or ill-will, and therefore differs from the vernacular understanding of malice." *In re Storms v. Action Wisconsin Inc.*, 2008 WI 56, ¶ 38, 309 Wis. 2d 704, 750 N.W.2d 739. "Rather, the plaintiff must demonstrate that the author in fact entertained serious doubts as to the truth of his publication, or acted with a high degree

of awareness of probable falsity." *Masson*, 501 U.S. at 510 (alteration adopted and quotations and citations omitted). "A public-figure plaintiff must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro*, 807 F.3d at 546 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

In his complaint, Fredin includes a number of statements in Klasfeld's article that he believes were defamatory. I'll separate these into two categories: (1) statements about Fredin's previous court cases; and (2) statements equating his conduct toward defendant Greenfield with his alleged harassment of women that is the subject of those previous court cases.

Regarding his previous court cases about harassment of women, Fredin identifies the following statements that he believes defamed him:

- "He has attacked the targeted women in their professional circles."

- Fredin "created harassing websites about them."

- Fredin has filed "retaliatory lawsuits."

- "share videos attacking people connected to his cases."

Dkt. 1-1, at 6–7. Fredin calls these statements false without elaborating.

For clarity's sake I will provide full paragraphs of Klasfeld's article to provide context for the first three of these quotes:

> In 2020, Fredin's penchant for filing at least a dozen retaliatory lawsuits—in state and federal jurisdictions in Wisconsin and Minnesota—led then-U.S. District Judge Susan Richard Nelson to declare him a "malicious and vexatious litigant," a designation requiring him to seek court approval before suing in her district.
>
> . . . .
>
> For the three women who won harassment restraining orders, Fredin's attacks on them appear to mirror his actions toward

> Greenfield, the clerk assisting the judge in Trump's case. He has attacked the targeted women in their professional circles, created harassing websites about them, and filed formal complaints against them, according to court filings.

*Id.*

In the article, Klasfeld makes clear that he draws this portion of his reporting from court opinions and other documents. My review of opinions in other federal cases involving Fredin show that the quotes that Fredin believes are defamatory are actually fair restatements of those opinions. *Fredin v. Middlecamp*, No. 17-CV-03058, 2020 WL 6867424, at *2 (D. Minn. Nov. 23, 2020) (stating in order sanctioning Fredin as a vexatious litigant that "Fredin has generated twelve lawsuits in Minnesota and Wisconsin state and federal courts (along with numerous unsuccessful appeals) in the last three years. . . . Notably, other courts have twice found that Fredin has used litigation to harass the Defendants, and one court has restricted his ability to file further lawsuits against them."), *aff'd*, 855 F. App'x 314 (8th Cir. 2021); *Fredin v. Middlecamp*, 500 F. Supp. 3d 752, 767 (D. Minn. 2020) (discussing 50-year harassment restraining orders issued against Fredin on the behalf of three women whom Fredin harassed in a variety of ways, including by creating websites about them, seeking his own TRO, and filing complaints to universities and professional organizations), *aff'd*, 855 F. App'x 314 (8th Cir. 2021). Nothing else in Fredin's complaint suggests a plausible basis for inferring that Klasfeld entertained serious doubts as to the truth of these statements, or that he acted with a high degree of awareness of probable falsity. So I conclude that he Fredin fails to plead an actual malice defamation claim regarding the first three of these quotes.[2]

---

[2] An alternate reason for dismissing these claims under New York law is that Fredin cannot maintain a libel action regarding fair and accurate reporting of his previous court cases. *See* N.Y. Civ. Rights Law § 74 ("A civil action cannot be maintained against any person, firm or

As for the fourth quote, "share videos attacking people connected to his cases," Fredin's complaint cuts off the quote in a way that hinders its meaning. Klasfeld's article stated the following:

> Other similarly-named YouTube pages, like @JudicialGrift, @JudicialTyranny, and @JudicialDissent share videos attacking people connected to his cases, including attorneys, judges, and law enforcement, but the owner of the account cannot be confirmed.

Dkt. 1-1, at 6. So this isn't directly a statement that Fredin shared the videos. But construing Fredin's pro se complaint generously, I take him to be alleging that Klasfeld defamed him by insinuating that Fredin used these other accounts to harass people connected to his cases.

A defamation claim can be premised on implications raised by otherwise true statements. *Mach v. Allison*, 259 Wis. 2d 686, ¶ 12, 656 N.W.2d 766 (Wis. Ct. App. 2002); *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380–81, 649 N.E.2d 825 (1995). But generally, defamation claims must be based on statements of fact rather than expressions of opinion. *Wagner v. Allen Media Broad.*, 2024 WI App 9, ¶ 40 n.9, 410 Wis. 2d 666, 3 N.W.3d 758; *Davis v. Boeheim*, 24 N.Y.3d 262, 269, 22 N.E.3d 999, 1004 (2014). In particular, a "'pure expression of opinion' occurs when a speaker states the facts upon which the speaker's opinion is based, and then states an opinion that is based on those facts." *Wagner*, 2024 WI App 9, ¶ 40 n.9 (citing Restatement (Second) of Torts § 566 (1977)); *see also Davis*, 24 N.Y.3d at 269.

corporation, for the publication of a fair and true report of any judicial proceeding . . . .); *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2017) (New York courts adopt a "liberal interpretation of the 'fair and true report' standard of § 74 so as to provide broad protection to news accounts of judicial proceedings." (alterations adopted and internal quotation omitted)). But Wisconsin's similar law likely does not apply to internet publications like *The Messenger*. *Cf. It's In the Cards, Inc. v. Fuschetto*, 193 Wis. 2d 429, 437, 535 N.W.2d 11, 14 (Wis. Ct. App. 1995) (related provision requiring that plaintiff seek retraction before filing libel lawsuit does not apply to internet publications).

A statement of opinion can support a defamation claim "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶ 14, 351 Wis. 2d 479, 840 N.W.2d 255; *see also Kasavana v. Vela*, 172 A.D.3d 1042, 1045, 100 N.Y.S.3d 82 (2019) (same)).

Fredin doesn't state a defamation claim with the fourth quote from Klasfeld's article. Klasfeld explicitly stopped short of saying that Fredin actually owned these other accounts. He insinuated that Fredin might own them but that's a statement of pure opinion that does not rely on an implication that Klasfeld knew other facts tying Fredin to those accounts. So this statement from Klasfeld's article doesn't support a defamation claim.

Fredin also quotes several statements by Klasfeld likening Fredin's communications about defendant Greenfield to Fredin's previous harassment of women, including:

- "[Fredin . . . has a prolific history of civil and criminal litigation over his] harassment of women that echoes his attacks on Greenfield."

- An article subheading titled: "Echoes of the attacks on the judge's clerk."

- "[Some three years before] targeting Greenfield, Fredin openly threatened other courtroom clerks whose judges ruled in favor of one of his victims."

- "[For the three women who won harassment restraining orders, Fredin's attacks on them] appear to mirror his actions toward Greenfield."

- [Summarizing baseless complaints that Fredin made against the three women who got harassment restraining orders against him and then stating] "This pattern continues with Trump's trial."

Dkt. 1-1, at 3, 7, 9–10.

I'll start with Klasfeld's statement that Fredin "openly threatened other courtroom clerks." In the article, Klasfeld follows that statement with further explanation, quoting an appellate brief in which Fredin stated that "'each clerk is going to get reported to the Professional Responsibility Board and websites are going up exposing you for your failure to

18

protect'" and that "court staff . . . would suffer a 'Billy Goat curse' or 'curse of the Bambino' for 'the next three hundred (300) years' for their handling of the case." *Id.* at 7–8. How "threatening" one might call that language is a matter of opinion but Klasfeld's statement otherwise is at least substantially true.

As for the other statements in this group, Fredin asserts that they "expressly insinuate[] and convey[] false and defamatory statements that [Fredin] is somehow criminally harassing Ms. Greenfield with his posts on @Judicial Protest." Dkt. 1, ¶ 37. But Klasfeld explicitly set forth Fredin's alleged misconduct in the restraining order cases and explained how it was similar to Fredin's actions toward Greenfield: he filed a bar complaint against Greenfield and copied a letter he sent to Judge Engoron's chambers about Greenfield to four state agencies and disciplinary committees. He also created a website with a URL using Greenfield's name to criticize her and ask visitors to call for her disbarment. Fredin doesn't assert that those allegations are untrue. Klasfeld indeed used words like "mirror" and echo" to compare Fredin's previous harassment of women with Fredin's criticisms of Greenfield, but those are clearly words that Klasfeld uses to convey his opinion about the similarity of Fredin's conduct toward multiple women including Greenfield. In short, nothing in Fredin's complaint suggests that Klasfeld included facts that he thought might be false, nor do his opinions rely on an implication that Klasfeld knew of other facts leading him to his opinion. He stated the relevant facts about Fredin's harassment cases and Fredin's treatment of Greenfield while giving his opinion about how similar they were. That isn't grounds for a defamation claim.

Fredin contends that everything that he posted about defendant Greenfield is true, that Greenfield and Judge Engoron committed various misconduct in handling the Trump fraud case, and that Fredin has the right to criticize them as public officials. But that's irrelevant to

the merit of Fredin's defamation claims against Klasfeld. I agree with Fredin that he has the general right to criticize public figures, but by the same token, Klasfeld has the right to publish his opinions about Fredin, particularly given the notoriety that Fredin gained during the Trump fraud trial. None of the quoted parts of Klasfeld's article comparing Fredin's actions toward Greenfield with Fredin's harassment of other women states a defamation claim.

Fredin contends that other portions of Klasfeld's article "assert[] that [Fredin] engaged in some kind of conspiracy with President Trump and acts as his agent or 'proxy' to post information about Ms. Greenfield." Dkt. 1, ¶ 40. Fredin includes the following quotes from Klasfeld's article in support:

- "Justice Engoron made clear that Trump and his attorneys cannot 'evade' his gag orders through "employees or agents."

- "Fredin's public statements show that he believes that Trump endorsed his sentiments."

- "Fredin seems to feel validated by Trump's attention."

- "It remains unclear how Trump learned about @JudicialProtest's social media account or why he decided to share it with an audience of millions."

- "Trump's attorney or surrogates repeatedly cited or boosted Fredin's online content."

Dkt. 1-1, at 3, 4–5, 6, 8. Fredin states that he has never had contact with Trump, anyone associated with him, or his campaign, and that he has never "acted on anyone else's behest or instruction with respect to the @JudicialProtest posts." Dkt. 1, ¶ 41.

I conclude that these statements do not support a defamation claim because each of the individual statements are either true or are Klasfeld's opinion, and in the context of Klasfeld's article, the statements do not insinuate that Fredin conspired with Trump. Rather, the article explicitly stated the opposite: "The Messenger found no evidence that Trump's attorneys or

surrogates communicated with Fredin or coordinated his attacks on [Greenfield] while the gag orders were in place. But the investigation found that Trump's attorneys and surrogates repeatedly cited or boosted Fredin's online content." Dkt. 1-1, at 4–5.

The final quotation from Klasfeld's article that Fredin believes is actionable is the following: "Fredin did not answer multiple phone calls to the phone number that he listed in court records, and he did not respond to email inquiries by the time of publication." Dkt. 1, ¶ 37. Fredin doesn't explain whether he is asserting that this is untrue because he did answer Klasfeld's inquiries or because Klasfeld did not attempt to contact him. Even if Klasfeld falsely stated that Fredin didn't respond to his calls or emails, that statement doesn't support a defamation claim because it isn't damaging enough to expose him to public contempt or lower the community's estimation of him. So Fredin's complaint doesn't state any defamation claims against Klasfeld or JAF Communications. I will grant that portion of their motion to dismiss.

### b.  Runyeon's article in *Law360*

Fredin doesn't explicitly include Runyeon as a defendant on the defamation count in his complaint but from his other allegations it seems like he intends to bring a defamation claim against Runyeon, and Runyeon addresses it in his brief. I'll address it too.

The basis for a defamation claim against defendant Runyeon is even thinner than a claim against Klasfeld. Runyeon's article, which Fredin calls "Runyeon's Pile-On Defense," Dkt. 1, at 9, doesn't mention Fredin; it is a rebuttal to the allegation in a Breitbart News story that Greenfield's political contributions surpassed the limit for New York court-system employees. I take it that the Breitbart story was at least in part sourced from Fredin's postings, which would make Runyeon's article an indirect rebuttal to Fredin's posts.

But Fredin doesn't say what's false about Runyeon's article other than that he disagrees with the legal analysis Runyeon provides stating that Greenfield didn't violate ethics rules. Runyeon's reporting provides quotes from various lawyers explaining why Greenfield's contributions were acceptable under court-system ethics rules. Runyeon himself didn't make any false statements, and even if the legal analysis ultimately were to prove incorrect, it is a presentation of opinion, not fact, and thus not the proper subject of a defamation claim.

### 2. Remaining claims

Fredin also brings claims of tortious interference with contract and intentional infliction of emotional distress, along with claims of conspiracy to defame him and to interfere with a contract. His claims of conspiracy are how he includes defendant Greenfield, who didn't write either of the allegedly defamatory articles. Fredin's allegations regarding these claims are extremely vague but I take him to be saying that Greenfield fed Klasfeld information and all three defendants conspired with each other to strike back against Fredin's criticism of Greenfield, including by contacting Fredin's employer and professional relationships in a way that—along with Klasfeld's and Runyeon's articles—caused Fredin's termination.

But Fredin's allegations about defendants' conspiracy and their direct contacts with his employer or other professional relationships are too vague to tell what the substance of those activities were, which is insufficient to state a plausible claim for relief. Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief" so that defendants understand the claims against them; Fredin's vague allegations regarding defendants' conspiracy against him and defendants' contacts with his employer do not meet this standard.

As for Fredin's theory that Klasfeld's and Runyeon's articles themselves interfered with a contract or inflicted emotional distress upon him, in both Wisconsin and New York plaintiffs cannot bring other tort claims essentially restating defamation claims. *Dumas v. Koebel*, 2013 WI App 152, ¶ 26, 352 Wis. 2d 13, 841 N.W.2d 319 (dismissing intentional-infliction-of-emotional-distress and contract-interference claims regarding matters of public concern as barred by First Amendment defense to tort suits articulated in *Snyder v. Phelps*, 562 U.S. 443 (2011)). *Cummings v. City of New York*, No. 19-CV-7723, 2020 WL 882335, at *27 (S.D.N.Y. Feb. 24, 2020) ("[A] tort claim based on the same conduct underlying a defamation claim fails as a matter of law, because 'New York cases have held that a separate cause of action for what are essentially defamation claims should not be entertained.'" (quoting *Anyanwu v. Columbia Broad. Sys., Inc.*, 887 F. Supp. 690, 693 (S.D.N.Y. 1995))). So I will dismiss those claims.

I conclude that Fredin's allegations, as presently constructed, do not state any claims for relief.


CONCLUSION

I will grant defendants' motions to dismiss Fredin's complaint. But because the court of appeals has cautioned against dismissing an unrepresented plaintiff's case without giving the plaintiff a chance to amend the complaint, *Felton v. City of Chicago*, 827 F.3d 632, 636 (7th Cir. 2016), I will give Fredin a chance to submit an amended complaint addressing these problems. If he fails to do so by the deadline set below, I will dismiss the case.

In their motions to dismiss, defendants also contend that Fredin failed to properly serve them. Fredin moves for an extension of his service deadline to fix these deficiencies. Dkt. 34. The court previously informed the parties that it directed the clerk of court to withhold issuing

summonses to Fredin unless his claims survived the motions to dismiss. Dkt. 40. I will grant Fredin's extension of time to properly serve defendants, but I'll set a new deadline for doing so if Fredin files an amended complaint that properly states claim for relief, in which case the court will direct the clerk to issue him summonses.

## ORDER

IT IS ORDERED that:

1. Defendants' motions to dismiss the complaint, Dkt. 8; Dkt. 18; Dkt. 37, are GRANTED. Plaintiff Brock Fredin's complaint, Dkt. 1, is DISMISSED.

2. Plaintiff's motion for an extension of time to correct service deficiencies, Dkt. 34, is GRANTED.

3. Plaintiff may have until April 14, 2025, to submit an amended complaint.

Entered March 21, 2025.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge